22          February 18, 2020          No. 2

## IN THE OREGON TAX COURT
## REGULAR DIVISION

T-MOBILE USA, INC.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5321)

On cross-motions for summary judgment, the parties disagreed whether two of Plaintiff's subsidiaries—one providing financing to customers and another providing reinsurance of device protection plans purchased by customers—were properly included in the valuation unit. The court found that the incidental business exclusion under ORS 308.515(4) requires a two-step analysis by Defendant: (1) Determine whether the company is actively engaged in a business that is not subject to central assessment. (2) If so, ask whether the second business is "incidental" to the company's centrally assessed business. "Incidental" in ORS 308.515(4) refers to a business subordinate to or dependent on the primary, centrally assessable, business of the company. The court held that both subsidiaries were in a subordinate and dependent relationship with Plaintiff's centrally assessable business.

Oral argument on cross-motions for summary judgment was held February 6, 2019, in the courtroom of the Oregon Tax Court, Salem.

Cynthia M. Fraser, Garvey Schubert Barer, Portland, Ted W. Friedman, Eversheds Sutherland LLP, New York, and Eric J. Tresh, Eversheds Sutherland LLP, Atlanta, filed the motion and argued the cause for Plaintiff.

Daniel Paul and James C. Strong, Senior Assistant Attorneys General, Department of Justice, Salem, filed the motion and argued the cause for Defendant.

Decision for Defendant rendered February 18, 2020.

**ROBERT T. MANICKE, Judge.**

### I.   INTRODUCTION

Plaintiff T-Mobile USA, Inc. contests an opinion and order of defendant Department of Revenue determining

that plaintiff's centrally assessed property in Oregon had a real market value (RMV) and assessed value (AV) of $72,720,000 for the tax year 2017-18.[1] Plaintiff asserts that Defendant erred by including in the valuation unit property of two subsidiaries, T-Mobile Financial LLC ("Finance Co") and TMUS Assurance Corporation ("Insurance Co"). Defendant asserts that it properly included the value of Finance Co's and Insurance Co's property in the valuation unit.

## II.   FACTS

The following facts are not in dispute and apply for the tax year at issue. Plaintiff is a corporation organized under the laws of Delaware, with its headquarters in Bellevue, Washington, and qualified to do business in Oregon. Plaintiff has certain subsidiaries (collectively, the "OpCos") that are primarily engaged in the sale to the public of wireless communication services and the sale of wireless devices (the "Equipment") such as smartphones and tablets. The court uses the term "Wireless Business" to mean the business of selling these services and the Equipment, whether directly by Plaintiff or through any affiliate. When the court finds it necessary to refer to one or more legal entities engaged in the Wireless Business, the court uses the term "OpCo" or applies the collective name "T-Mobile," consistent with the parties' stipulation.[2]

Plaintiff also is the sole member of Finance Co, a Delaware limited liability company that is disregarded

---

[1] For background on "central" vs. "local" assessment of property, particularly communication property, *see Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 289-95, 337 P3d 768 (2014); *DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 257, 434 P3d 379 (2019) (discussing the differences between central assessment and local assessment); *see also Level 3 Communications, LLC III v. Dept. of Rev.*, 23 OTR 440 (2019).

[2] The stipulation generally describes the business operations of Plaintiff T-Mobile USA, Inc. and the OpCos collectively and defines that group of legal entities collectively as "T-Mobile." The stipulation does not, however, include Plaintiff in the defined terms "Finance Co" and "Insurance Co." This leaves unclear to what extent, if at all, Plaintiff itself engages in the Wireless Business or in the Finance Co or Insurance Co businesses. The point has no legal significance here, as will be explained below in discussing the broad definition of "company" in ORS 308.505(13) as interpreted in *Southern Pacific Trans. Co. v. Dept. of Rev.*, 295 Or 47, 56, 664 P2d 401 (1983). By using the parties' label "T-Mobile," the court implies nothing about the nature of the activities of plaintiff T-Mobile USA, Inc.

for purposes of federal income tax and thus for purposes of Oregon property tax.[3] Finance Co provides installment plan financing to select individual customers who initially buy wireless service from T-Mobile and who buy Equipment from T-Mobile retail stores or from independent third-party retailers like Costco and Car Toys.[4] Finance Co allows customers to continue financing the purchases of Equipment if the customers change wireless service to a different wireless service provider, subject to certain conditions. T-Mobile does not require customers to buy Equipment from T-Mobile as a condition of selling wireless service to them; nor does T-Mobile require customers to borrow money from Finance Co in order to pay for Equipment they choose to buy from T-Mobile. [Reference to Finance Co operational facts redacted.] Finance Co provides no services to customers other than financing for purchases of Equipment. [Reference to Finance Co operational facts redacted.] The officers, managers, and employees of Finance Co are either officers, directors, or employees of T-Mobile.

Plaintiff also is the sole shareholder of Insurance Co, an insurance company incorporated and licensed under laws of Hawaii. Insurance Co reinsures third-party insurers that provide optional device protection plans for Equipment that customers choose to buy and use in connection with Wireless services sold by T-Mobile. Insurance Co does not provide insurance coverage to customers. Insurance Co provides no services to customers other than reinsurance. T-Mobile advertises and sells the handset protection plans, and protection under the plans is contingent on continued subscription to T-Mobile's wireless services. [References to Insurance Co operational facts redacted.] The officers, directors and employees of Insurance Co are either officers, directors, or employees of Plaintiff.

---

[3] [Reference to confidential document redacted.] *See* Treas Reg § 301.7701-2(a) ("A business entity with only one owner is classified as a corporation or is disregarded; if the entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner."); ORS 63.810 (applying federal income tax classifications for purposes of various Oregon taxes, including property tax).

[4] The court uses the term "customer" to mean end users of T-Mobile communication services and Equipment.

The parties also stipulated to the authenticity of numerous exhibits. The court will discuss relevant exhibits and additional facts as appropriate.

### III.   ISSUE

May Defendant consider the value of the property of Insurance Co and Finance Co for purposes of determining the value of Plaintiff's property assessable in Oregon for tax year 2017-18?

### IV.   STANDARD OF REVIEW

The court grants a motion for summary judgment only if "the pleadings, \*\*\* declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C. *See United Streetcar v. Dept. of Rev.*, 23 OTR 418 (2019) (citing *Two Two v. Fujitech America, Inc*., 355 Or 319, 331, 325 P3d 707 (2014)). Each party that moves for summary judgment has the burden of demonstrating that there are no material issues of fact and that the movant is entitled to judgment as a matter of law. *McKee v. Gilbert*, 62 Or App 310, 321, 661 P2d 97 (1983). The court must view the evidence and all reasonable inferences it may support in the light most favorable to the nonmoving party and determine whether the moving party, despite that view of the evidence, is entitled to judgment as a matter of law. TCR 47 C; *Towe v. Sacagawea, Inc*., 357 Or 74, 77 n 2, 346 P3d 1207 (2015) (on review of summary judgment, evidence is viewed in light most favorable to nonmoving party).

### V.   ANALYSIS

The parties have stipulated to facts and documents that clearly show that Finance Co and Insurance Co perform certain financial and reinsurance activities. The overarching question is whether or how Defendant must separate those activities (and the property and value associated with them) from the property and value associated with Plaintiff's centrally assessed Wireless Business. Each party presents a very different way of analyzing the issue.

A.   *Parties' Arguments*

Plaintiff asks the court to order Defendant to remove the property of Finance Co and Insurance Co from the unit of property that Defendant values, on the grounds that the property of Finance Co and Insurance Co is not used in a centrally assessed business and therefore is not "property" as defined in ORS 308.505(14)(a).[5] Plaintiff proffers a three-step analysis for this case:

> "First, it must be determined whether the taxpayer performs one of the specifically enumerated centrally assessable services under ORS 308.515(1).[6] Second, if the taxpayer does perform one of the centrally assessable services, it must be determined which 'property' is 'used' by the taxpayer 'for the performance' of the centrally assessable service and therefore meets the definition of centrally assessable 'property' under ORS 308.505(14). Third and finally, if the property at issue is in fact centrally assessable and [the defendant] determines that unit valuation is appropriate, it must then be determined whether property located outside the State must be excluded from the unit 'to the end that the fair proportion of the property of the company in this state may be ascertained,' under ORS 308.555."

Plaintiff argues that Defendant failed to take the second step and thus ignored the limiting principle that property must be used or held for future use in a centrally assessed business before its value can be counted as part of any unit value. Plaintiff then argues that the property of Finance Co and Insurance Co must be excluded because it is used, respectively, in the financial and reinsurance businesses and not in the centrally assessed communication business.[7]

---

[5]  The court's references to the Oregon Revised Statutes (ORS) are to 2017.

[6]  The next paragraph in Plaintiff's brief indicates that, by "taxpayer," Plaintiff is referring in this case to Finance Co and Insurance Co: "Since it is undisputed that T-Mobile provides a centrally assessable wireless communication service, the gating question in this case is whether the property *of Finance Co. and Insurance Co.* is used in performing T-Mobile's wireless communication service and meets the definition of 'property' under ORS 308.505(14) subject to central assessment, i.e., step two." (Emphasis added.) As discussed below, the definition of "company" for central assessment purposes requires a broader inquiry.

[7]  Plaintiff also argues that Defendant incorrectly purported to "assess" the "businesses" of Finance Co and Insurance Co. The court addresses this argument below when applying the court's analytical framework to the facts.

Defendant's analysis does focus on Plaintiff's third step—exclusion from the unit under ORS 308.555—and Defendant argues that the property of Finance Co and Insurance Co must be included because that property is integrated with the communication business, citing the Oregon Supreme Court's decision in *Southern Pacific Trans. Co. v. Dept. of Rev.*, 295 Or 47, 57, 664 P2d 401 (1983). Defendant then makes an alternative argument that the property of Finance Co and Insurance Co is incidental to the communication business.

B.  *The Court's Analytical Framework*

Given the parties' disparate views of the operation of the statutes, the court starts by setting forth the analytical framework for the first set of steps that Defendant must undertake in the central assessment process, beginning with identification of a centrally assessed business and ending with identification of a unit of value within and without Oregon. The parties' motions raise no issues regarding Defendant's later steps, which include formulary allocation of the unit value to Oregon (ORS 308.550); apportionment of value to localities within Oregon (ORS 308.565); and transmission of the central assessment roll to county assessors for billing purposes (ORS 308.621(2)). Accordingly, this order does not discuss those or other subsequent steps.

1.  *Starting point: ORS 308.515(1)*

The court agrees with Plaintiff that the starting point is ORS 308.515. Defendant must first determine whether the "company," as defined in ORS 308.505(13), performs or maintains a business listed in ORS 308.515(1). If so, Defendant must centrally assess the property the company uses or holds for future use unless another statute directs otherwise.

ORS 308.515(1) provides, in relevant part:

"(1)  The Department of Revenue shall make an annual assessment of any property that has a situs in this state and that * * * is used or held for future use by any company

in performing or maintaining any of the following businesses or services[8] * * *

"* * * * *

"(h)  Communication * * *."

In any case involving complex ownership structures, the unique meaning of "company" for central assessment purposes is important. ORS 308.505(13) provides:

> "'Person,' 'company,' 'corporation' or 'association' means any person, group of persons, whether organized or unorganized, firm, joint stock company, association, cooperative or mutual organization, people's utility district, joint operating agency as defined in ORS 262.005, syndicate, entity formed to partner or combine public and private interests, partnership or corporation engaged in performing or maintaining any business or service or in selling any commodity as set forth in ORS 308.515, whether or not the activity is pursuant to any franchise and whether or not the person or other entity or combination of entities possesses characteristics of limited or unlimited liability."

Thus, the singular terms "company" and "corporation" are synonyms and also include a "group" or "combination" of legal entities. *Id.* The legislature has defined the terms "expansively," and the Oregon Supreme Court has specifically held that a "parent corporation together with a subsidiary can be a 'corporation' or 'company' within this definition. * * * [T]he legal form in which the company uses or holds the property is largely irrelevant to whether it is the company's 'property' within the ambit of the statute." *Southern Pacific*, 295 Or at 57-58.

       As shown above, Plaintiff refers repeatedly to Finance Co and Insurance Co as separate legal entities whose

---

[8] The same key text, that the property be "used or held by a company * * * for the performance or maintenance" of a centrally assessed business, is repeated in the definition of "property" in ORS 308.505(14)(a). Plaintiff often refers to that definition, rather than to ORS 308.515(1), as the source of the requirement to separate the property of Finance Co and Insurance Co from property used or held in the centrally assessed communication business. In the court's view, it is first necessary to apply ORS 308.515(4) to determine whether the business in which the property is used is incidental to, and thus deemed a component of, the centrally assessed business. If so, the property used in the incidental business is centrally assessed and ORS 308.505(14)(a) does not provide an independent basis to exclude it.

business activities and property use must be tested under the central assessment statutes. Defendant does the same, framing the issue as "whether *Finance Co. and Insurance Co.* are 'connected directly' with T-Mobile's wireless communications business" and purporting to "show how T-Mobile used *Finance Co.'s and Insurance Co.'s respective property* in *its* business to operate it at its highest and best use * * *." (Emphases added.) The court interprets those descriptions as shorthand, reasonable in the circumstances, as this case happens to involve a fairly clear alignment between the business activities (finance and reinsurance) and the legal entities that conduct those activities (respectively, Finance Co and Insurance Co). ORS 308.515(1), however, requires Defendant to focus on the business or businesses conducted throughout the larger enterprise, without regard to lines of ownership among affiliates. As wholly owned affiliates, Finance Co and Insurance Co, along with the OpCos, are part of the "company" of which Plaintiff is a part.

After determining whether the "company" engages in a centrally assessed business, Defendant must apply the following statutes in sequence:

2.  *Incidental business exclusion: ORS 308.515(4)*

Like ORS 308.515(1), ORS 308.515(4) focuses on the nature of the company's business. ORS 308.515(4) provides:

> "Any corporation included within subsection (1) of this section, *to the extent* that it actively engages in any business or service *not described therein or not incidental to* any business or service *or* sale of a commodity described therein, may not to that extent be deemed a corporation whose properties are assessed under ORS 308.505 to 308.681."

(Emphases added.) Subsection (4) requires Defendant to determine to what extent a company that performs or maintains a centrally assessable business *also* engages in a *second* business that is either *(a)* not on subsection (1)'s list of centrally assessed businesses or *(b)* not "incidental" to a centrally assessed business.[9] *See Southern Pacific*, 295 Or at 53 ("Property is subject to the assessment only if put to one of

---

[9] As shown above, "company" is synonymous with "corporation." *See* ORS 308.505(13).

the designated uses; an included corporation is excluded to the extent that it actively engages in a business 'not incidental' to that designated, ORS 308.515(4).").) Because the court believes that the parties' disagreement arises largely under ORS 308.515(4), the court now discusses its scope in some detail.

The court's first task in interpreting subsection (4) of ORS 308.515 is to determine how the portions the court has labeled as parts *(a)* and *(b)* relate to each other. The court concludes that part *(b)* can have meaning only if the court reads "or" as "and." For example, assume that a hypothetical company operates a toll bridge in Oregon,[10] and also sells a software application that allows motorists to pay the toll from an electronic device rather than by stopping at a toll booth to deposit cash. If the "or" connecting parts *(a)* and *(b)* presents two mutually exclusive alternatives, Defendant might conclude that the business of developing and selling software is not a centrally assessed business pursuant to part *(a)*, and that the property used or held for use in the software business therefore must be locally assessed. But to stop after that conclusion would render part *(b)* inoperable. Indeed, part *(b) presupposes* that under part *(a)* the company engages in both a business that is centrally assessed and another business that is not; otherwise, Defendant cannot analyze whether the second business is incidental to the first. *See Burke v. DLCD*, 352 Or 428, 436-37, 290 P3d 790 (2012) (citing Reed Dickerson, *The Fundamentals of Legal Drafting* 104 (2d ed 1986)) ("[I]n legal drafting, it is more often the case that the connective 'or' is used in the inclusive sense *** [w]hether the disjunctive 'or' is inclusive or exclusive will depend on its context."). The court concludes that Defendant must apply subsection (4) as a two-step analysis, first asking whether the company is actively engaged in a business that is not subject to central assessment. If the company *is* engaged in a noncentrally assessed business, Defendant must then ask whether that second business is "incidental" to the company's centrally assessed business. If so, the company's entire property is centrally assessed. Only if the second business is *not* incidental to the centrally assessed business does Defendant go on to determine the

---

[10] ORS 308.515(1)(m) includes a toll bridge as a centrally assessed business.

extent of the second business and, from there, seek to identify property used or held for use in that second business that must be locally assessed instead of centrally assessed.

The court next turns to the meaning of "incidental" in ORS 308.515(4), which no court has squarely addressed.[11] The court applies the approach prescribed in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), and considers the text, context, and, if helpful, the legislative history of ORS 308.515(4). Starting with the text, the central assessment statutes do not define the word "incidental." Although the legislature enacted the central assessment statutes in 1909, *see Level 3 Communications, LLC III v. Dept. of Rev.*, 23 OTR 440 (2019), the legislature first added the word "incidental" to what is now ORS 308.515(4) in 1951. Or Laws 1951, ch 586, § 2 (HB 590). At that time, the most recent edition of *Webster's* defined "incidental" as:

> "Happening as a chance or undesigned feature of something else; casual; hence, not of prime concern; subordinate; as, an *incidental* expense. 2. Liable to happen or to follow as a chance feature or incident; as, the trials *incidental* to married life. 3. Met by chance; chance; as, an *incidental meeting*. *Rare*. 1. That which is incidental; esp.; pl. subordinate or incidental items not particularized; as, the expense of tuition and *incidentals*."

---

[11] The Oregon Supreme Court has only once mentioned "incidental," as used in ORS 308.515(4). In footnote 17 of its opinion in *Southern Pacific*, 295 Or at 62 n 17, the court briefly considered whether the *stock* of a subsidiary was intangible property that should be included in or excluded from the unit. The court's footnote apparently was prompted by the parties' stipulation to the effect that "five California *affiliates* are properly within its valuation unit." *Id.* (emphasis added). Responding to the parties' formulation, which seems to have conflated the affiliated legal entities with whatever property they used or held, the court stated that the parent company's interest in the affiliates was incidental to the parent company's business. *Id.* The court's overall point, in the footnote and throughout the opinion, was that the subsidiary's property was included because the parent controlled that property; the fact that the parent did so by the means of owning nearly all the stock of the subsidiary did not matter. The court's reference in footnote 17 must be read together with its clear statement near the beginning of the opinion that "[p]roperty is subject to the assessment only if put to one of the designated uses; an included *corporation* is excluded to the extent that it actively engages in a business 'not incidental' to that designated." *Id.* at 53 (emphasis added). More recently, in *Comcast Corp. v. Dept. of Rev.*, 20 OTR 319, 336 n 14 (2011), *rev'd on other grounds*, 356 Or 282 (2014), this court explained only that whether one of two businesses operated by the same company is "incidental" to the other under ORS 308.515(4) is a separate question from whether the property of such a company is "primarily" used in one business or the other under ORS 308.510(4). Each of these brief references is consistent with the analytical framework in this order.

*Webster's New Int'l Dictionary* at 1257 (2nd ed 1934) (emphases in original); *see also Comcast*, 356 Or at 296 n 7 (instructing that when the legislature leaves a term undefined, the court consults contemporaneous dictionary definitions of the term). The primary definitions of "incidental" as an adjective emphasized items or events arising by "chance," while the definition listed as "rare" defined the plural noun "incidentals" as "subordinate" or nonparticularized items.

A contemporaneous legal dictionary defined "incidental" as:

> "[d]epending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal; something incident to the main purpose."

*Black's Law Dictionary*, 942-43 (3rd ed 1933). The legal definition emphasized the "primary"-"subordinate" dependency relationship listed as "rare" in *Webster's*.

From this plain meaning analysis, the court concludes that "incidental" as used in ORS 308.515(4) could refer to an activity happening by chance, or to an activity subordinate to, and depending on, the primary, centrally assessable, activity of the company.

Turning to statutory context, the same section of the 1951 act that added what is now ORS 308.515(4) also included the phrase below, in the list of centrally assessed businesses now codified in ORS 308.515(1):

> "water transportation upon inland waters of the State of Oregon including interstate rivers and standing waters, and tide waters extending to the ocean bar, *but not when incidental to transportation upon the high seas \*\*\**."

Or Laws 1951, ch 586, § 2.[12] (Emphasis added.) The court has found no cases or other guidance interpreting "incidental to transportation upon the high seas," and the legislature

---

[12] The 2017 edition of the central assessment statutes also uses the term "incidental" in ORS 308.516(2)(a), which excludes from central assessment a company generating electricity for its own use and making "no more than incidental sales" of surplus electricity to others. The legislature first adopted that provision in 1957, however, and the court does not analyze it as context relevant to the legislature's intent in 1951. *See* Or Laws 1957, ch 711, § 3.

eliminated the term in a later statutory revision. *See* Or Laws 1955, ch 735, § 1. The plain text of this provision appears to support a meaning of "incidental" in line with the contemporaneous *Black's Law Dictionary*. Oregon geography being what it is, a freighter would "incidentally" travel less than one hundred miles from Portland to the Columbia Bar off Astoria solely as a means to reach the high seas where it would spend the primary part of its voyage. The incidental distance between a coastal port such as Coos Bay and the high seas would be even shorter.

Other statutes in place in 1951 used the word "incidental" to describe a relationship between two activities. The Unemployment Compensation Law stated:

"(D)  Service shall be deemed to be localized within this state if:

"*****

"(1)  The service is performed entirely within this state; or

"(2)  The service is performed both within and without this state, but the service performed without the state is *incidental* to the individual's service within the state."

OCLA § 126-702(f)(D)(2) (emphasis added). In one pre-1951 case interpreting this act, the Supreme Court declined to hold that a barge worker's activities in the Columbia River were localized in either state, because the barge spent about one-half the time in each state and there was no evidence that the work in either state was otherwise incidental to the work in the other state, as for example temporary or isolated transactions might be. *See Puget Sound B. & D. Co. v. S. U. C. C.*, 168 Or 614, 629, 126 P2d 37 (1942).

The Workers' Compensation Law stated:

"Farming, and all work *incidental* thereto, is a non-hazardous occupation ***. Farming means the cultivating of land, dairying, *** and operations *incidental* thereto; also, when *incidental* thereto, *** land clearing with or without blasting, wood sawing, wood cutting, *** whether or not such operations are carried on by the owner of the farm, the person operating it or by any other person. *** None of the occupations enumerated by sections 102-1725

and 102-1736 shall be deemed hazardous when conducted by a farmer *incidental* to his farming operation."

OCLA § 102-1727 (emphases added). In *State Ind. Acc. Com. v. Eggiman*, 172 Or 19, 24-25, 139 P2d 565 (1943), the Industrial Accident Commission, which had paid a worker's compensation claim for injuries suffered by a worker in felling trees on the defendant's land, sought to recover the payment from the defendant as putative employer. The defendant argued that he was not liable on the grounds that the logging activity was incidental to farming and thus was excluded from workers' compensation coverage. The court agreed with the defendant based on findings that his principal business was farming. Although the defendant arranged to have a certain amount of wood cut each year for sale as firewood, and the proceeds in some years exceeded his income from farming, the court found that the defendant's annual logging activities on his own land served the primary purpose of clearing the land, thus extending the scope of his pasture land for his dairy operation. The court held that the logging activities were "incidental" to farming.

The 1951 legislature is deemed to have been aware of these other uses of the term "incidental" in Oregon statutes, and also aware of the Supreme Court opinions interpreting the word. *See, e.g.*, *Moro v. State of Oregon*, 354 Or 657, 665-66, 320 P3d 539 (2014) ("In interpreting statutes, this court presumes that the legislature is aware of existing law and this court's interpretation of that law."). The court concludes that relevant context confirms that the legislature intended "incidental" in ORS 308.515(4) to refer to a business subordinate to, or depending on, the primary, centrally assessable, business of the company.[13] To the extent

---

[13] The available legislative history of the 1951 act is sparse. The bill (HB 590) apparently was introduced at the request of the State Tax Commission. Minutes, Senate Tax Committee, Apr 26, 1951, 1 ("The Chairman stated that the Tax Commission wants this bill and amendments have been worked out by the Commission and interested taxpayers."). An undated memorandum from the "Legal Department" of the State Tax Commission to House Revenue Committee member Giles French states, in apparent reference to the sentence now codified as ORS 308.515(4), that the Commission intended that "a utility operation of any company which may constitute only a part of the operations of that company is subjected to assessment by the commission ***." Memorandum from the Oregon State Tax Commission to Representative Giles French (undated) (on file with the Oregon State Archives). The court finds little guidance in this reference because

that a company operates a business that is incidental to the company's centrally assessed business, Defendant must not exclude property used or held for future use in the incidental business.

### 3.    *Dual-use property: ORS 308.510(4)*

Defendant's next step, if it identifies any business or businesses that are *not* at least incidental to the centrally assessed business, is to assign any dual-use property to either the centrally assessed business or to the second, non-centrally assessed business. ORS 308.510(4) provides the mechanism to do this:

> "Property found by the Department of Revenue to have an integrated use for or in more than one business, service or sale, where at least one such business, service or sale is one enumerated in ORS 308.515, shall be classified by the department as being within or without the definition of property under ORS 308.505, according to the primary use of such property, as determined by the department."

The statute requires Defendant to determine the "primary use" of any such dual-use property. Defendant must classify property primarily used in the centrally assessed business (including any businesses incidental to the centrally assessed business) as centrally assessed.

### 4.    *Unit valuation and "deductions" from the unit: ORS 308.555*

Finally, ORS 308.555 applies after Defendant has excluded any property used in a nonincidental second business, and any dual-use property whose use in a centrally assessed business is not primary. ORS 308.555 provides:

> "The Department of Revenue, for the purpose of arriving at the assessed value *of the property assessable by it*, *may* value the entire property, both within and without the State of Oregon, as a unit. *If* it values the entire property as a unit, either within or without the State of Oregon, or both, the department shall make *deductions of the property of the company situated outside the state, and not connected*

---

it seems to describe only the general concept that the same company might conduct both centrally assessed and noncentrally assessed businesses; it does not suggest how to determine whether one such business is "incidental" to the other.

*directly with the business thereof*, as may be just, to the end that the fair proportion of the property of the company in this state may be ascertained. *If* the department values the entire property within the State of Oregon as a unit, it shall make *deductions of the property* of the company situated in Oregon, and *assessed by the county assessors*, to an amount that shall be just. For that purpose the county assessors shall, if the department so requests, certify to the department the assessed value of the property of the companies assessable by them, but such certification of assessed value is intended to be advisory only and is not conclusive upon the department."

(Emphases added.) By its plain language, the statute applies only with respect to "the property assessable by [Defendant]." This means that Defendant must first undertake the three steps outlined above to determine whether, and to what extent, it is dealing with a *business* of a type whose property in Oregon Defendant must centrally assess. Defendant has discretion to choose to value as a unit the property remaining after excluding any property that Defendant must allocate to a nonincidental, noncentrally assessed business.

> a.  Property outside the scope of the valuation unit

The first sentence of ORS 308.555 authorizes Defendant to undertake unit valuation. The legislature has not materially changed the text of this sentence since its first enactment in 1909. *See* Or Laws 1909, ch 218, § 10. Applying the analysis set forth in *Gaines*, the plain meaning of "unit," based on contemporaneous dictionary definitions, is "[a]ny determinate amount or quantity (as of length, time, heat, value) adopted as a standard of measurement for other amounts or quantities of the same kind[,] \*\*\* [a] single thing, as a magnitude or number, regarded as an undivided whole." *Webster's Int'l Dictionary of the English Language* 1576 (1907). As pointed out above, the context of the statute includes contemporaneous constitutional case law on defining the scope of the unit. That case law indicates that the main determinant of whether property is within the unit is its use in the business as part of an integrated whole, consistent with the latter part of the dictionary definition. *E.g.*, *Adams Express Co. v. Ohio State Auditor*, 165 US 194,

224, 17 S Ct 305, 41 L Ed 683 (1897) (quoting *State v. Jones*, 37 NE 945, 950, 51 Ohio St 492 (1894) ("But the property of a corporation may be regarded, in the aggregate, as a unit, an entirety, as a plant designed for a specific object; and its value may be estimated, not in parts, but taken as a whole."). Most relevant for this case are the United States Supreme Court opinions involving "express" delivery companies, as those companies, unlike electric companies, telegraph and telephone companies and railroads, generally did not use capital-intensive, special-purpose property easily identifiable with the particular line of business, such as large power generation plants, or miles of tracks or wire. *See* James C. Bonbright, 2 *The Valuation of Property*, 654 (1937) ("The novel element in these cases is the application of the unit rule to companies possessing ordinary kinds of property, having a market value ascertainable in the ordinary way."). Rather, the greatest part of the "unit" consisted of intangible property, referred to as the "franchise" or "capital stock" or goodwill. *See Adams Express*, 165 US at 224-25. The Court held that inclusion of that property in the valuation unit did not violate the United States Constitution, resolving a major question about the extent to which a state could include property in the unit other than the real and tangible personal property visibly used in the centrally assessed business.

More recent cases indicate that integration of the property remains essential to determining the existence or nonexistence of the "unity of use" found in *Adams Express. See, e.g., Alaska Airlines, Inc. v. Dept. of Rev.*, 307 Or 406, 415, 769 P2d 193 (1989) (citing *Adams Express*, 165 US at 222 ("a state may value as a unit an integrated business enterprise operating in interstate commerce"; finding taxpayers' aircraft properties were "used in an integrated and coordinated manner")); *Union Pacific Railroad v. Dept. of Rev.*, 315 Or 11, 13, 843 P2d 864 (1992) (recounting history of merger of the three formerly separate operating entities; stating that "[b]y the earliest assessment date involved in this case—January 1, 1983—the three were operating as one integrated unit, and they have been assessed as such in this case"); *Southern Pacific Trans. Co. v. Dept. of Rev.*, 302 Or 582, 590-91, 732 P2d 18 (1987) ("A determination that an entity is part of

a unit is a determination that the operation of that entity is integrated with the remainder of the unit in such a way that it is impossible to ascertain sufficiently the separate value of the entity apart from the unit."). Defendant has adopted an administrative rule that seeks to state facts on which Defendant may rely, including "[f]unctional integration, determined by looking at the operation of the property used in the business at its highest and best use," and "[i]ntegration of management, administration, marketing, financing, use of employees and other resources of the business in which the property is used * * *." OAR 150-308-0660(3). Defendant also has adopted the Western States Association of Tax Administrators (WSATA) Handbook, which contains similar discussions. *See, e.g.*, WSATA Handbook at I-12 (2009) ("In order to include out-of-state property in the appraisal unit, the appraiser must demonstrate that it is an integral part of the interstate system and logically adds to the value of the intrastate unitary property."); OAR 150-308-0690 (adopting WSATA Handbook by reference).[14]

A major predecessor of the Oregon Supreme Court opinions cited above addresses the composition of the unit in the context of railroad property operated through a group of affiliated corporations. *See Southern Pacific*, 295 Or at 49 ("The problem to be resolved is the test for determining the scope of the valuation unit."). The case involved two railroad lines operating in different parts of the country, one of which was owned by the parent corporation Southern Pacific Transportation Company (Southern Pacific) and the other by its 99.7 percent subsidiary referred to in the opinion as the Cottonbelt.[15] Southern Pacific used property in Oregon and

---

[14] Defendant at one point refers to a passage in the WSATA Handbook that discusses the "unit" as including "'all assets owned, used, and/or leased by a firm and needed in the operation of its business.'" WSATA Handbook at I10 (quoting National Conference of Unit Valuation States (NCUVS), "Public Utility Appraisal Standards," Standard I. B. (October, 2005)). Plaintiff argues that neither the Finance Co property nor the Insurance Co property is "needed" in the Wireless Business because the Wireless Business operated before Finance Co and Insurance Co were formed, and the Wireless Business could continue to operate without them. The test, as just described, is integration, not whether an item of property is so essential that the centrally assessed business would come to a halt without that property.

[15] The "Cottonbelt" appears to have been the common name of a corporation whose formal name was the St. Louis & Southwestern Railroad. *See Southern*

sought to exclude from the valuation unit the Cottonbelt's property, all of which was outside Oregon. Although both lines obviously were within the description of the centrally assessed business of "railroad transportation," Southern Pacific argued that the two lines, and the legal entities that held them, used separate accounting and were separately regulated, and that they were insufficiently integrated in management, operations, and geographic connection to justify valuation as a unit.

The court held that Southern Pacific "used" the property of the Cottonbelt because Southern Pacific controlled the Cottonbelt through ownership of nearly all stock of the Cottonbelt. *See id.* at 62. This control through ownership of stock distinguished the Southern Pacific/Cottonbelt relationship in an industry in which even independently owned railroads were characterized by a high level of operational integration. *See id.* at 52 ("The nation's railroads interchange cars, materials, and running repairs, maintain joint inspections and facilities, permit one carrier's locomotives to run through the lines of another, use standardized equipment and central computer monitoring of traffic, and support industry-wide research.").[16] The court also found additional indicators that Southern Pacific used the Cottonbelt's property: The principal officers and almost all directors of the Cottonbelt were officers or directors of Southern Pacific, and Southern Pacific controlled the marketing, financing, management, operations and labor of the Cottonbelt. *See id.* at 49-50, 62. Under *Southern Pacific*, therefore, Defendant must examine whether a company subject to Oregon central assessment also "uses" the non-Oregon property,[17] including

---

*Pacific Transportation v. Dept. of Rev.*, 9 OTR 481, 483 (1982), *rev'd on other grounds*, 295 Or 47, 664 P2d 401 (1983).

[16] For this reason, the court rejected this court's attempt in that case to determine the scope of the unit based solely on a list of factors demonstrating the presence or absence of integration. *See id.* at 62 ("Moreover, even a considerable degree of operational integration shows nothing about the property connection between two companies in an industry so pervasively interconnected as railroading.").

[17] For example, this court's failure to test for the right to control the property, including through control of legal entities that own the property, was held erroneous in *PacifiCorp Power Marketing v. Dept. of Rev.*, 340 Or 204, 214-15, 131 P3d 725 (2006).

through "control" of other legal entities that directly use the property. *See id.* at 62-63.

There may be substantial overlap between the kinds of facts needed to determine whether an otherwise locally assessed business is "incidental" to a centrally assessed business under ORS 308.515(4) and those facts needed to determine whether particular property belongs in the unit under ORS 308.555. Indeed, this court has not always clearly distinguished between the two inquiries. Defendant cites another of the *Southern Pacific* cases, in which this court considered four subsidiaries: two "private car companies," a company that "own[ed] and rehabilitate[d] railroad rolling stock which it then lease[d] to [Southern Pacific]," and "a finance company formed to raise capital for" one of the private car companies. *Southern Pacific Trans. Co. v. Dept. of Rev.*, 11 OTR 138, 141 (1989). The court reviewed ORS 308.515(1) only to the extent of rejecting the taxpayer's argument that, because that statute *lists* "private car companies" separately from "railroad transportation" companies, the property of the private car companies also must be *assessed* separately from that of the railroad transportation parent. *Id.*[18] The court did not specifically address whether the "finance company," or the company that rehabilitated and leased cars, engaged in noncentrally assessed businesses that were incidental to Southern Pacific's railroad transportation business. Instead, the court concluded summarily that the property of all four subsidiaries was included in Southern Pacific's valuation unit, based on evidence that the equipment leasing company "deals solely with [Southern Pacific]"; and that "[t]he other three companies appear to operate to some degree as part of plaintiff's railroad operation." *Id.* at 141-42.

Thus, the first sentence of ORS 308.555 requires Defendant to examine the degree of integration of property in the unit, ignoring the corporate structure or lines of ownership among affiliated entities under common control. The remainder of ORS 308.555 outlines two "deductions" that

---

[18] The court stated that the taxpayer's argument "assumes that the statute precludes one from being part of the other. The *** purpose of [ORS 308.515(1)] is to identify properties subject to central assessment, not define the unit." *Id.*

Defendant must apply if Defendant chooses to value the company's centrally assessable property as a unit. These deductions reflect judicial opinions around the time the Oregon legislature enacted what is now ORS 308.555.

> b. Property outside Oregon that is not "connected directly" with the centrally assessed business

The second sentence of ORS 308.555 requires Defendant to deduct the value of any property outside Oregon that is not "connected directly" with the company's centrally assessed business. Defendant must deduct the value of this property so as to determine the "fair proportion" of the company's centrally assessable property in Oregon. It is important to recall that, under ORS 308.515(4), the centrally assessed business includes any business incidental to the centrally assessed business. Therefore, the second sentence of ORS 308.555 requires Defendant to deduct property that is not "connected directly" with the centrally assessed business *and* not "connected directly" with any incidental businesses. The apparent purpose of the "connected directly" exclusion in ORS 308.555 is to avoid distortion when the overall value of the unit is allocated in part to Oregon based on a formula. The "connected directly" exclusion avoids distortion primarily by eliminating "nonoperating property" outside Oregon, *i.e.*, property that the company does not hold for any business purpose but rather for reasons unrelated to the business, such as investment. For example, as noted in *Southern Pacific,* Defendant and its predecessor agency have excluded, "almost since day one," promissory notes and shares of stock in corporations, even though the legislature first added an express exclusion for those items in 1977, in what is now ORS 308.505(14)(c). *See Southern Pacific*, 295 Or at 59 & n 14, 62-63 & n 17. The original basis for excluding those items was that they "are held merely for their money equivalent and could be exchanged without affecting the business of the company. A minority stock interest held for investment would be excluded because it is held merely as evidence of indebtedness." *Id.* at 63 n 17. Thus, the term "connected directly with the business" in ORS 308.555 "paraphrases" and reinforces the requirement that property be used or held for future use in performing or maintaining a centrally assessed business. *Id.* at 59 n 14. For a leading

United States Supreme Court case contemporaneous with enactment of Oregon's central assessment regime, *see Fargo v. Hart*, 193 US 490, 501, 24 S Ct 498, 48 L Ed 761 (1904) (excluding from express company's property tax base large holdings in bonds that did not contribute to company's goodwill). *See generally* Bonbright, 2 *Valuation of Property* at 662 (discussing exclusion of out-of-state real property, securities and other nonoperating property); WSATA Handbook at I11 to I12.

> ### c.   Property in Oregon that is assessed locally

The last two sentences of ORS 308.555 require Defendant to make a "just" deduction for any Oregon property in Oregon that local county assessors have assessed.

## C.   *Application of Analytical Framework*

> ### 1.   *Starting point: ORS 308.515(1)*

The parties agree that at least some of the legal entities comprising the "company" in this case, namely Plaintiff and the OpCos, are engaged in the Wireless Business, which is a "communication" business on the list in ORS 308.515(1) whose property Defendant must centrally assess. The court therefore proceeds to the next step.

> ### 2.   *Incidental business exclusion: ORS 308.515(4)*

The court views the main issue in this case as whether the "company" of which Plaintiff is a part is engaged in a business that is not on the list of centrally assessed businesses, but that is "incidental" to the Wireless Business. It is clear from the parties' stipulations that the company, through Finance Co and Insurance Co respectively, is engaged in the consumer product financing business and the reinsurance business. The remaining question is whether the company operates those businesses in a manner incidental to the Wireless Business.

Starting with the Finance Co business, many facts indicate that this business is "subordinate" to or "dependent" on the centrally assessed Wireless Business. First, customers must be purchasing wireless service through T-Mobile before they will be offered financing. If a customer

later switches to a different service provider, the customer may continue any existing financing through Finance Co, but there is no evidence that Plaintiff markets the services of Finance Co to customers initially subscribing to competitors of T-Mobile or to anyone else. The Finance Co business is, therefore, entirely dependent on the advertising, marketing and sales efforts that the company conducts through T-Mobile. [References to Finance Co operations redacted.] The entire set of employees, officers, and directors working in the Finance Co business also works in the Wireless Business. The court readily concludes that the Finance Co business, having no other customer base, [confidential information redacted] is subordinate to, and depends on, the Wireless Business. This subordinate and dependent relationship appears to be intentional: [References to Finance Co operational facts redacted.]

The Insurance Co business presents similar facts. The company, through T-Mobile, advertises and sells device protection plans that cover Equipment it markets to the public. Customers retain coverage under the plans only while they continue to subscribe to T-Mobile communication service. [References to Insurance Co operational facts redacted.][19] [References to Insurance Co operational facts redacted.] Insurance Co reinsures the risk that [number redacted] insurers assume, and there is no evidence that Insurance Co engages in any other insurance or reinsurance activities. Thus, like the Finance Co business, the Insurance Co business is entirely dependent on the efforts that the company through T-Mobile undertakes to sell underlying plans to customers and to contract with the insurers with which Insurance Co ultimately enters into reinsurance contracts. Furthermore, the Insurance Co business depends entirely on individuals employed in or governing the T-Mobile business, or on third parties with which Plaintiff contracts, to collect and pay all bills, fulfill all claims, and otherwise administer the reinsurance contracts. The Insurance Co business thus depends completely on the T-Mobile communication

---

[19] [Reference to confidential document redacted.] This contradicts the parties' stipulation that "T-Mobile USA, Inc. is the sole shareholder of Insurance Co." As explained above, any mischaracterization in the stipulations on this point is "irrelevant" under *Southern Pacific*. *See* 295 Or at 57-58.

business to operate the Insurance Co business. The court concludes that the Insurance Co business, [reference to Insurance Co operational facts redacted] and with no way to operate except through administrative services provided through T-Mobile, is subordinate to, and depends on, the communication business.

Plaintiff takes particular issue with a portion of Defendant's opinion and order that states:

> "T-Mobile's financial and insurance businesses operate exclusively to finance and insure mobile phones purchased by T-Mobile's customers. Thus, these businesses constitute property 'owned' and 'used' by T-Mobile 'in performing or maintaining' its 'communication' business or service. ORS 308.515(1)(h). As such, the property supports and is incidental to T-Mobile's other communication property. Only if the businesses were not used in or incidental to T-Mobile's communication business or service could the department remove such property from the unit assessed. ORS 308.515(4)."

Plaintiff faults this passage for incorrectly implying that the business of Finance Co or the business of Insurance Co is property. Plaintiff is correct that, based on the court's analytical framework, the passage is inaccurate and generally conflates the terms "business" and "property." ORS 308.515(4) does not direct Defendant to test whether any *property* is "incidental" to other *property*. Nor does any part of the central assessment statutes direct Defendant to test whether a *business* is "used" in another *business*.[20]

Plaintiff cites these errors in urging the court to conclude that the Finance Co and Insurance Co property is not used or held for use in the centrally assessed communication business. However, Plaintiff's argument relies on an excessively narrow identification of the Wireless Business, essentially ignoring the fact that ORS 308.515(4) sweeps into central assessment any business that the company operates in a manner "incidental" to a centrally assessed business. A business within the same "company" that

---

[20] Rather, as explained above, one *business* may be incidental to another, *see* ORS 308.515(4)), and a "company" may "use" *property* in a business that is on the list of centrally assessed businesses in ORS 308.515(1). *See* ORS 308.515(1), ORS 308.505(14)(a).

depends completely on the company's Wireless Business for its clientele and personnel operates in a manner incidental to the Wireless Business. Therefore, although one typically might not think of "consumer product financing" and "reinsurance" as parts of a communication business, the facts in this case show that it is quite possible to operate them that way.

For the foregoing reasons, the court concludes that the Finance Co and Insurance Co businesses are "incidental to" the Wireless Business and that Defendant must centrally assess the property used or held for future use in the Finance Co and Insurance Co businesses as part of Plaintiff's communication business.

3.  *Dual-use property: ORS 308.510(4)*

Having concluded that the company operates the Finance Co and Insurance Co businesses incidentally to the Wireless Business, the court has no reason to consider the possibility of "dual-use" property, as there is no noncentrally assessed business to which any property could be assigned.

4.  *Unit valuation and "deductions from the unit: ORS 308.555*

    a.  Property outside the scope of the valuation unit

The court easily concludes that all property used or held for use in the Finance Co and Insurance Co businesses is includible in the valuation unit. Plaintiff nowhere contends that Finance Co uses or holds any property for a use other than in the Finance Co business, nor does Plaintiff contend that Insurance Co uses or holds property for a use other than in the Insurance Co business. Rather, Plaintiff argues that Finance Co and Insurance Co use no property in the *communication* business. That is equivalent to an argument that the Finance Co *business* and the Insurance Co *business* are not part of the communication business. As discussed above, that argument properly lies under ORS 308.515(4). Because the court holds that the Finance Co and Insurance Co businesses are incidental to the Wireless Business, there is no basis to conclude that the property that Finance Co

and Insurance Co use or hold is outside the scope of the valuation unit.

If the court nevertheless tests whether the property that Plaintiff's "company" uses in the Finance Co and Insurance Co businesses is sufficiently integrated with the property the company uses in the Wireless Business to constitute part of the same unit, it is quickly apparent that the facts showing that the Finance Co and Insurance Co businesses are incidental to the communication business also show that the property used and held in all three businesses is integrated. The [reference to Finance Co operational facts redacted] is fully integrated with the property used in the Wireless Business, not merely because the individuals using that property also work for T-Mobile, but also because the Finance Co property helps sell Equipment, [reference to Finance Co operational facts redacted.] Finance Co enters into "equipment installment plan" contracts with customers, and those contracts are intangible property that derives entirely from marketing and sales efforts by personnel working in the Wireless Business.[21] [Reference to Finance Co operational facts redacted.] It is hard to imagine a more tightly integrated set of property rights.

Turning to Insurance Co, the court finds an even deeper enmeshment, as Insurance Co [confidential information redacted] thus depends entirely on facilities used by Plaintiff's employees or agents doing double duty in the Wireless Business. [Reference to Insurance Co operational facts redacted.] The fruit of these efforts is the set of reinsurance agreements between Insurance Co and the third-party insurers selected by T-Mobile; these contracts (the parties again refer to the "receivables" from them) are Insurance Co's only property. That property exists solely because of the efforts of T-Mobile employees or agents, including the property they use. The court concludes that the property of Insurance Co is completely integrated with the property used in the Wireless Business.

---

[21] [References to Finance Co operational facts redacted.] Because the parties introduced substantial documentary evidence supporting their stipulations, the court construes the stipulations in accordance with that evidence and focuses on the contracts. The receivables themselves may be mere "[c]laims on other property" or "notes," outside the definition of "property." *See* ORS 308.505(14)(c)(A).

Because the court concludes that the property is fully integrated with property used or held in a single, centrally assessed business, the court notes only briefly that the "control" test that the Oregon Supreme Court used in *Southern Pacific* also is satisfied by virtue of Plaintiff's sole ownership of Finance Co and Insurance Co. *See Southern Pacific*, 295 Or at 62.

      b.   Property outside Oregon that is not "connected directly" with the centrally assessed business

Turning to the second sentence of ORS 308.555, neither party has identified any property outside Oregon that is not connected directly with any of the Wireless Business, the financial services business operated through Finance Co, or the reinsurance business operated through Insurance Co.

      c.   Property in Oregon that is assessed locally

Neither party has identified any property within Oregon that any county assessor has purported to assess. The court sees no basis for deduction under ORS 308.555.

## VI.  CONCLUSION

For the preceding reasons, the court concludes that Defendant properly included the property that Finance Co and Insurance Co owned, used or held for future use in the valuation unit of Plaintiff for tax year 2017-18 because the businesses of Finance Co and Insurance Co were incidental to the company's Wireless Business under ORS 308.515(4), all property at issue was fully integrated in the Wireless Business, Plaintiff controlled Finance Co and Insurance Co, and there is no basis to exclude the property used in the Finance Co or Insurance Co business from the unit. Now, therefore,

IT IS ORDERED that Plaintiff's motion for partial summary judgment is denied; and

IT IS FURTHER ORDERED that Defendant's motion for summary judgment is granted, subject to any further proceedings regarding the value of the unit as defined in a manner consistent with this order.